UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

THOMAS GRILLEA,

Plaintiff,

-against-

UNITED NATURAL FOODS, INC.,

Defendant.

-------------------------------------------------------X

FEUERSTEIN, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 3 1 2016 ★

LONG ISLAND OFFICE

**OPINION & ORDER**
16-CV-3505 (SJF)(SIL)

I.    Introduction

On June 24, 2016, plaintiff Thomas Grillea ("plaintiff") commenced this action against

defendant United Natural Foods, Inc. ("defendant"), pursuant to this Court's diversity of

citizenship jurisdiction, 28 U.S.C. § 1332(a), seeking, *inter alia*, (1) judgment declaring that a

non-competition clause in a severance agreement executed by him is unenforceable; and (2)

damages under the theory of promissory estoppel and for defendant's alleged breach of contract

and tortious interference with prospective economic advantage.  Pending before the Court is

plaintiff's motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary

injunction enjoining defendant from enforcing the non-competition clause against him.  For the

reasons set forth below, plaintiff's motion is denied.


II.    Background

A.    Factual Background

Defendant is a Delaware corporation with its principal place of business in Providence,

Rhode Island, (Second Amended Complaint ["SAC"], ¶ 3), and is a wholesale distributor of

natural and organic foods; personal care, health and beauty products; vitamins; and nutritional

supplements throughout the United States and Canada, (Declaration of Tom Dziki ["Dziki Decl."], ¶ 4; Declaration of Dennis Hatchett ["Hatchett Decl."], ¶ 4), that does not sell directly to consumers. (Dziki Decl., ¶ 4). According to Tom Dziki ("Dziki"), a senior vice president of defendant, (*id.*, ¶ 2), defendant "has a total of approximately 29 competitors in the natural and organic product distribution business[,]" (*id.*, ¶ 5), that "sell similar products to the same primary category of customers as [defendant]: retail businesses[,]" (*id.*), including "Threshold Distributing." (*Id.*, Ex. 1). Defendant "does not compete with its customers [*i.e.*, retail businesses] or its suppliers[,]" (*id.*, ¶ 6), and does not manufacture supplements. (Affidavit of Thomas Grillea in Support of Motion for Preliminary Injunction ["Plf. Aff."], ¶ 31).

Plaintiff is a citizen of the State of New York, (SAC, ¶ 2), who, from 2006 to 2015, served as a division president responsible for various divisions of defendant, including its Select Nutrition division. (*Id.*, ¶ 7; *see also* Plf. Aff., ¶¶ 3, 6; Dziki Decl., ¶ 7; Declaration of Joseph Traficanti ["Traficanti Decl."], ¶ 5). According to Dennis Hatchett ("Hatchett"), who replaced plaintiff as the division president of defendant's Select Nutrition division, (*see* Hatchett Decl., ¶¶ 2-3), defendant's Select Nutrition division is a national distributor of vitamins, supplements, personal care items and sports nutrition products "headquartered in Uniondale, New York, [with] distribution centers in Philadelphia Pennsylvania and Auburn, California[,] . . . [and] a dedicated customer service staff in [defendant's] distribution center in Iowa City, Iowa." (*Id.*, ¶¶ 5-7)[1]. Hatchett avers that "[t]here are three companies that compete directly with Select Nutrition: Palko Distributing Company ('Palko'); Lotus Light ('Lotus'); and Threshold Enterprises [Ltd.] ('Threshold')[,]" (*id.*, ¶ 8), insofar as those "three companies all distribute similar, and

---

[1] *See also* www.selectnutrition.com (last visited 8/16/16).

sometimes the same, products as Select Nutrition to the same general category of customers, [*i.e.*,] retail businesses." (*Id.*) According to Hatchett, defendant "considers Palko and Threshold [to be] the main competitors of Select Nutrition because Lotus operates on a smaller scale." (*Id.*) Like defendant, Select Nutrition "does not compete with its 9,000 customers [*i.e.*, retail businesses] or its suppliers." (*Id.*, ¶ 9).

As a division president, plaintiff "was one of the 8 highest level executives at [defendant] . . . [,] a member of the Executive Leadership Team and an Officer of [defendant]," (Dziki Decl., ¶ 7; *see also* Plf. Aff., ¶ 10 ["As an Officer within the company . . ."]; *id.*, ¶ 11 [accord]), and, therefore, "had extensive access to information about [defendant's] sales, customers, marketing strategies, pricing, profits, and planned acquisitions." (Dziki Decl., ¶ 8). According to Dziki, that "information is highly valuable and is kept confidential at [defendant], usually with distribution being limited to members of the Executive Leadership Team." (*Id.*, ¶ 8).[2]

Dziki avers, by way of example, that "at Leadership Team meetings, which [plaintiff] attended on a monthly basis, [plaintiff] was provided with written information identifying [defendant's] top 100 customers, their sales volume and other information relevant to the meeting in question[;] . . . [and] confidential subjects were often discussed . . . , such as division financial results, customer satisfaction issues and strategies for addressing them, sales and marketing strategies, competitive analyses and multi-year strategic plans for [defendant]." (Dziki Decl., ¶ 9; *see also* Plf. Aff., ¶ 14 [indicating what allegedly occurred during a "monthly

---

[2]  Contrary to plaintiff's contention in his reply declaration, Dziki's "primary experience . . . of directing [defendant's] Human Resources Department[,]" (Plf. Reply at 6), as well as his position as defendant's senior vice president, renders him well-qualified to discuss the nature and duties of defendants' employment positions, including the duties of division president and the Executive Leadership Team, and to draw conclusions regarding to what information such employees had access and to what employees certain information is distributed.

leadership meeting, which includes all C-level . . . Officers and Directors" of defendant that was held in July 2010]).  According to Dziki, that "information is confidential, highly valuable to [defendant], and is maintained as confidential . . . through the use of limited disclosure, contractual confidentiality obligations, and physical and electronic security measures."  (Dziki Decl., ¶ 9).  In addition, Dziki avers that "in his role as President of Select Nutrition, [plaintiff] also participated in meetings, and was given access to information about, confidential incentive programs with its suppliers, including those who manufacture vitamins and supplements.  This information included pricing arrangements, negotiating strategies, sales volumes and purchasing data, and contract terms."  (Dziki Decl., ¶ 10).  According to Dziki, since "[t]he information provided to [plaintiff] is not generally known in the natural foods industry, nor is it disclosed outside [defendant][,] [i]t would . . . be highly valuable to a direct competitor of [defendant] for several years."  (*Id.*, ¶ 11).

Dziki avers that "[p]art of [plaintiff's] job involved the development of strategies to address threats to (Select Nutrition's) market share from its competitors[,] . . . [including] Threshold Enterprises."  (Dziki Decl., ¶ 12).  According to Dziki, "[w]hile [plaintiff] was still actively employed, [defendant] learned that Threshold was planning to open a new distribution center on the East Coast[,] [and] [plaintiff] was responsible for developing Select Nutrition's competitive strategy to offset and combat Threshold's increased East Coast presence."  (*Id.*)  That "strategy involved supplier arrangements, discounting and related pricing strategies, and was not disclosed outside [defendant]."  (*Id.*)  However, plaintiff denies that he ever "developed Select Nutrition's competitive strategy to offset and combat Threshold's increased East Coast presence."  (Plf. Reply, ¶ 12).

In 2009, plaintiff executed a Severance Agreement, effective April 1, 2009, (SAC, ¶ 9 and Ex. 1; Plf. Aff., ¶ 26 and Ex. 1; Dziki Decl., ¶ 13; Traficanti Decl., ¶ 4), which contains the following non-competition clause:

> "During the term of employment, and for a period of one year following termination of such employment for any reason or payment of any compensation, whichever occurs last, [plaintiff] shall not engage, directly or indirectly (which includes, without limitation, owning, managing, operating, controlling, being employed by, giving financial assistance to, participating in or being connected in any material way with any person or entity), anywhere in the United States in any activities with the following companies, that include Tree of Life or any of its subsidiaries, Nature's Best, C&S Distributors or any other company which is a direct competitor of [defendant] with respect to (i) [defendant's] activities on the date hereof and/or (ii) any activities which [defendant] becomes involved in during [plaintiff's] term of employment; provided, however, that [plaintiff's] ownership as a passive investor of less than two percent (2%) of the issued and outstanding stock of a publicly held corporation so engaged, shall not by itself be deemed to constitute such competition. Further, during such one-year period [plaintiff] shall not act to induce any of [defendant's] vendors, customers or employees to take action might [sic] be disadvantageous to [defendant] or otherwise disturb such party's relationship with [defendant]."

(Plf. Aff., Ex. 1, § 6(b)). In addition, the Severance Agreement contains the following provision:

> "[Plaintiff] recognizes that the possible restrictions on [his] activities which may occur as a result of [his] performance of [his] obligations under this Agreement are required for the reasonable protection of [defendant] and its investments, and [plaintiff] expressly acknowledges that such restrictions are fair and reasonable for that purpose. [Plaintiff] further expressly acknowledges that damages alone will be an inadequate remedy for any breach or violation of any of the provisions of this Agreement, and that [defendant], in addition to all other remedies hereunder, shall be entitled, as a matter of right, to injunctive relief, including specific performance, with respect to any such breach or violation or threatened breach of violation, in any court of competent jurisdiction. If any of the provisions of this Agreement are held to be in any respect an unreasonable restriction upon [plaintiff] then they shall be deemed to extend only over the maximum period of time, geographic area, and/or range of activities as to which they may be enforceable. [Plaintiff] expressly agrees that all payments and benefits due [him] under this Agreement shall be subject to [his] compliance with the provisions set forth in this Section 6."

(*Id.*, § 6(e)).  The Severance Agreement further provides that "its validity, interpretation, performance, and enforcement shall be governed by the law of [the] State [of Connecticut]." (*Id.*, § 7).

In or about February 2015, plaintiff was notified that his employment with defendant was being terminated.  (*See* Plf. Aff., ¶¶ 23-25; Dziki Decl., ¶ 15; Traficanti Decl., ¶ 6).  According to Dziki and Joseph Traficanti, defendant's senior vice president, general counsel and chief compliance officer, (Traficanti Decl., ¶ 2), when plaintiff was notified of his termination, he "requested, and [defendant] agreed, to allow him to remain on its payroll as an inactive employee" for a period of approximately six (6) or seven (7) extra months, in order to allow plaintiff "to bridge the gap necessary" for certain of his stock options to vest.  (Dziki Decl., ¶ 15 [seven months]; Traficanti Decl., ¶ [six months])[3].  Dziki avers that at that time, he explained to plaintiff "that, under [defendant's] policies and practices, he would not accrue additional vacation or Paid Time Off during his period of inactivity."[4]  (Dziki ¶ 17).  Indeed, a First Amendment to the Severance Agreement ("the Amendment") was executed by the parties in March 2015, (*see* SAC, ¶ 10 and Ex. 2; Plf. Aff., ¶ 26; Dziki Decl., ¶ 13), "for the good and valuable consideration set forth [t]herein *but to also include [plaintiff's] desire and [defendant's]*

---

[3]  According to Dzikis, "the total value of the stock options that were allowed to vest was $202,609.65."  (Dzikis Decl., ¶ 18).

[4]  Traficanti also avers that "[u]nder [defendant's] policies and practices, [plaintiff] did not accrue additional vacation or Paid Time Off during his period of inactivity."  (Traficanti Decl., ¶ 7).  In addition, Traficanti and Dziki both aver that defendant "never agreed to make an exception to its policies for [plaintiff] in this situation, especially since his additional seven months of employment was already benefitting him by allowing his options to vest."  (Dziki Decl., ¶ 17; Traficanti Decl., ¶ 7).

*agreement for [his] continued employment beyond the date [t]hereof.*"  (Plf. Aff., Ex. 2 at 1)

(emphasis added).

      The Amendment revised Section 2 of the Severance Agreement to provide, in pertinent

part:

> "In the event [plaintiff] is terminated or resigns prior to any Severance Date
> agreed upon by [the parties] for reasons other than Cause, Death or Disability, in
> addition to the payment of any unpaid base salary and accrued and unpaid
> vacation ['Paid Time Off'] as of the date of such termination or resignation,
> [defendant] shall continue [plaintiff's] base salary and medical benefits in effect
> as of the date of such termination or resignation for a period of one (1) year,
> subject to applicable withholding and deductions. . . ."

(*Id.*, ¶ C)[5].

      In addition, the Amendment provides, in relevant part, that Section 6 of the Severance

Agreement "remain[s] in effect[.]" (Plf. Aff., Ex. 2, ¶ F).  Pursuant to the Amendment, plaintiff

agreed, *inter alia*, (i) to "[i]mmediately cease acting as President of Select Nutrition, LLC;" (ii)

to "[w]ork with Dennis Hatchett as directed to prepare and train him, as necessary, to fully

---

[5]  Section 2 of the Severance Agreement provides, in pertinent part:

> "In the event (a) [plaintiff] is terminated for reasons other than Cause, death or
> Disability or (b) [plaintiff] resigns for Good Reason, in addition to the payment of
> any unpaid base salary and accrued and unpaid vacation as of the date of such
> termination or resignation, [defendant] shall continue [plaintiff's] base salary
> and medical benefits in effect as of the date of such termination or resignation
> for a period of one (1) year, subject to applicable withholding and deductions. . .
> ."

(Plf. Aff., Ex. 1).  While the definitions of the terms "Cause" and "Disability" in that provision remained unchanged by the Amendment, the Amendment expressly revoked, *inter alia*, the definition of the term "Good Reason" therein.  (Plf. Aff., Ex. 2, ¶ B).

transition him to lead Select Nutrition, LLC;" and (iii) to "[w]ork on special projects, as directed from time to time, on behalf of [defendant], during [his] employment; (iv) to "[c]ontinue [his] employment beyond April 1, 2015 until September 30, 2015, fully engaging and completing any and all special projects assigned to [him] by [defendant], and, in further consideration of continuing employment until September 30, 2015, . . . to resign from [defendant] on September 30, 2015 ('Severance Date') and . . . to begin receiving bi-weekly severance payments, beginning October 1, 2015, equal to my salary rate as of September 30, 2015 as well as medical benefits under [defendant's] current medical plans until April 1, 2016, at which time I agree to cease receiving any further salary and medical benefits from [defendant] whether under [the] Severance Agreement or any other agreement or Company policy and, thus, be fully severed from [defendant]. . . ." (*Id.*, ¶ G).

Plaintiff was paid his full salary during the period between the date the Amendment was executed and the Severance Date , *i.e.*, from on or about March through September 30, 2015 ("the Interim Period"). (Plf. Aff., ¶ 28; *see also* SAC, ¶ 14; Plf. Reply, ¶ 13). At the time his employment with defendant was terminated, plaintiff earned an annual salary of three hundred nine thousand dollars ($309,000.00). (Dziki Decl., ¶ 7). In addition, plaintiff was paid for all Paid Time Off and vacation time that he had accrued as of April 2015, (*id.*, ¶ 17; Traficanti Decl., ¶ 7), and he received the severance payments due him under the Severance Agreement and Amendment, (SAC, ¶ 16; Plf. Aff., ¶ 29; Dziki Decl., ¶ 18; Traficanti Decl., ¶ 8), which ended on April 15, 2016. (SAC, ¶ 16; Plf. Aff., ¶ 29). However, plaintiff claims that he "did not receive the accrued [Paid Time Off] or vacation from April 2015 through September 30, 2015 that [he] was entitled to receive under the 2015 Amendment[,]" (Plf. Aff., ¶ 28); and that the value of such accrued Paid Time Off is approximately twelve thousand dollars ($12,000.00).

(SAC, ¶ 18). According to plaintiff, "[w]hen he questioned [defendant] about payment for the accrued [Paid Time Off], he was told that he was an 'inactive employee' and therefore was not eligible for the vacation accrual[,]" (*id.*, ¶ 19); but "the 2015 Amendment did not change his title or status as an employee and [he] was afforded all of the other employment benefits like health insurance and a 401k contribution to which he was entitled." (*Id.*)

Dziki avers that he "had no business interaction with [plaintiff]" and was not aware "of any active work performed by [plaintiff]" during the Interim Period, (Dziki Decl., ¶ 16); and that plaintiff's "email address at the time was disabled, and he was assigned a new email address to insure that he would not inadvertently become involved in communications related to [defendant's] day to day operations." (*Id.*) Traficanti similarly avers that he "had no interaction with [plaintiff]" during the Interim Period, (Traficanti Decl., ¶ 6), and that plaintiff "did not perform any active work" during the Interim Period. (*Id.*) In addition, Dziki and Traficanti each aver (1) that during the Interim Period, they "received no reports from [plaintiff], exchanged no substantive emails regarding day to day . . . operations [of defendant] with him, and did not see him in any [of defendant's] offices[,]" (Dziki Decl., ¶ 16); and (2) that they are not aware of any "work performed by [plaintiff][;] . . . [or] any interaction between [plaintiff] and any other . . . personnel [of defendant] regarding the business of [defendant]" during the Interim Period. (Dziki Decl., ¶ 16; Traficanti Decl., ¶ 6).

The SAC, which is signed by plaintiff's counsel but is not verified by plaintiff, alleges that during the Interim Period, plaintiff "performed all tasks asked of him, including assisting in the training of his successor." (SAC, ¶ 14). Plaintiff does not make a similar assertion in his affidavit in support of his motion for a preliminary injunction and avers in his reply declaration that he was given only a "few assignments" from April to September 30, 2015. (Reply

Declaration of Thomas Grillea in Support of Motion for Preliminary Injunction ["Plf. Reply"], ¶ 3).  In addition, plaintiff submits: (a) two (2) emails he sent to Dziki on April 7 and 8, 2015, indicating that he made "several customer calls" at the request of "Steve," presumably Spinner, (*id.*, ¶ 5 and Ex. 1), defendant's CEO, (SAC, ¶ 26); (b) an email from Rich Iannone ("Iannone") to several of defendant's employees, including Hatchett, sent May 5, 2015, indicating, in relevant part, that plaintiff "had asked that [Iannone] do whatever [he] can to assist the Select Team[,]"[6] (*id.*, ¶ 7 and Ex. 2); and (c) an email from Iannone to plaintiff, dated July 23, 2016, indicating that "[a]nother program [Iannone] put together to assist [S]elect [N]utrition after [plaintiff] called and asked for [his] assistance[] . . . [was] a $5 Million exclusive to [S]elect program w[ith] [N]atrol and Witz sons[] [in or about May 2015] . . . [b]ecause [plaintiff] asked [him] to assist them *after [his] departure*." (*Id.*, Ex. 2) (emphasis added).  Moreover, according to plaintiff, during the Interim Period, he was "permitted to use a . . . cell phone [provided by defendant] and laptop for [defendant's] business." (*Id.*, ¶ 5).

Plaintiff avers that since the Severance Date, he "received several inquiries about [his] availability to join another [sic] companies[,] [but] [he] ha[s] refrained from doing so[,]" (Plf. Aff., ¶ 29; *see also* SAC, ¶ 15), until he was approached by Threshold.  (*See* Plf. Aff., ¶ 32).  In April 2016, plaintiff called Traficanti, (SAC, ¶ 22; Plf. Aff., ¶ 32; Traficanti Decl., ¶ 9), "to discuss offers [he] had received from other companies[,]" (SAC, ¶ 22; Plf. Aff., ¶ 32), and the non-competition clause. (Traficanti Decl., ¶ 9).  According to plaintiff, during that conversation,

---

[6] Contrary to plaintiff's assertion, Hatchett did not deny that he "did any work from April to September 2015." (Plf. Reply, ¶ 7).  Hatchett makes no representations whatsoever about plaintiff's relationship with defendant during the Interim Period.  Moreover, in the email by Iannone, he sets forth certain "[o]pportunities to discuss," including: "− Threshold: I can update you all on what I know.  I've had meetings with their executive team." (*Id.*, Ex. 2).

Traficanti told him that defendant "would have 'no problem if [he] worked in a manufacturing, supply or retail role within a natural foods organization." (Plf. Aff., ¶ 32; *see also* SAC, ¶ 22). According to Traficanti, plaintiff asked him when the non-competition clause ended and Traficanti "explained that it prevented him from working for a direct competitor for 1 year after the last severance payment was made under the agreement." (Traficanti Decl., ¶ 9). In addition, since plaintiff "did not identify any specific job or company he intended to work for" during that call, Traficanti "told him that if a specific opportunity came to his attention, he could (and should) contact [Traficanti] to discuss it before taking the position to make sure it complied with his agreement." (*Id.*) Traficanti denies ever indicating to plaintiff "that his proposed position [at Threshold] would be permissible under his non-compete agreement." (*Id.*, ¶ 13).

According to plaintiff, after Threshold contacted Dziki for an employment reference for him, he had a telephone conversation with Dziki during which Dziki told him "that, because the position was in manufacturing, the [non-competition clause] was not enforceable against him and that he should pursue the position with Threshold." (SAC, ¶ 23; *see also* Plf. Aff., ¶ 33)[7]. However, Dziki denies ever telling plaintiff "that his proposed job at Threshold would be permissible under his non-competition agreement." (Dziki Decl., ¶ 22).

According to Dziki, plaintiff called him in the Spring of 2016 "and asked for a reference for a job he was seeking at the time." (Dziki Decl., ¶ 21). After Dziki agreed, he "received a call from a Human Resources professional at Threshold . . . [during which] [t]he HR professional asked [him] about [plaintiff's] background, and specifically . . . [plaintiff's] participation on the

---

[7] Plaintiff's assertions in his reply declaration regarding what the director of human resources at Threshold told him during a recent telephone conversation between them, (Plf. Reply, ¶ 11), offered for the truth of the matters asserted therein, constitute inadmissible hearsay which have not been considered by the Court.

Executive Leadership Team at [defendant][,] . . . [and] indicated that Threshold was looking for someone with experience in larger organizations, because [it] was looking to grow in size." (*Id.*) Dziki avers that "[a]lthough [they] discussed various aspects of [plaintiff's] experience (including manufacturing), at no point did the HR professional indicate that [plaintiff's] position would be limited to manufacturing[,]" (*id.*); and "[a]t the end of the call," the HR professional asked Dziki if he thought "[plaintiff's] position would create a conflict of interest," and Dziki told him that he "believed it would." (*Id.*)

On or about May 30, 2016, plaintiff sent Traficanti a letter indicating, in relevant part:

> "After our discussion last month, I made a decision to move my family out West in the next few weeks and accept a role which I expect to be offered shortly in the manufacturing/supply side of the supplement industry as President and COO of Manufacturing of Planetary and Source Naturals.
> . . .
> I know with my over two decades within the supplement industry my experience will make me the best fit for this opportunity. We all know how small our industry is and I only hope our both companies can help one another in the future. I wish you and . . . [defendant] nothing but the best."

(Declaration of Thomas M. Lancia, Esq. ["Lancia Decl."], Ex. 2; *see also* Traficanti Decl., Ex. 1; Plf. Aff., ¶ 34). According to Traficanti, that letter was "the first time [plaintiff] identified any specific company which he intended to work for [sic][,]" (Traficanti Decl., ¶ 10), and since he "believed that Source Naturals was affiliated with [defendant's] competitor Threshold Enterprises, he sent an email to plaintiff on June 2, 2016 under the subject "Pls [Please] proceed with caution," indicating, in relevant part:

> "I have received your letter about being offered the job of COO of Planetary and Source Naturals. While I would like to offer congratulations I would also ask you to not do anything drastic in this regard until I can return to the office and do more research on this entity as well as re-review your severance agreement. Having said that, it is my understanding that this entity may be a part of or an affiliate of Threshold and, therefore, a direct competitor of Select. If that is true, . . . and if my recall of your remaining 10 to 12 months of your noncompete [sic] is correct, I regret that you may not be able to except this job.

I will be back to you soon . . . ."

(Lancia Decl., Ex. 2; *see also* Traficanti Decl., Ex. 2; Plf. Aff., ¶ 34).

Traficanti avers that "[a]fter investigating further, [he] confirmed that Source Naturals was [sic] a brand of supplements manufactured and distributed only by Threshold, in direct competition with [defendant]." (Traficanti Decl., ¶ 12). Accordingly, on June 17, 2016, Traficanti sent plaintiff a letter, and sent copies thereof to Spinner and Goldberg, indicating, in relevant part:

> ". . . As I noted in my [June 2, 2016] email and have now confirmed, [Planetary and Source Naturals] is an arm of and an affiliate of Threshold Enterprises, LTD, one of Select Nutrition's largest competitors, . . . .
>
> . . . Section 6 b. [of the Severance Agreement] prohibits you from competing against [defendant] or any of its affiliates, including Select Nutrition, for one year after your last payment pursuant to this severance agreement. Our records show that you received your last [severance] payment on April 15, 2016. Therefore, you are prohibited from competing against [defendant] or any of its affiliates until April 14, 2017.
>
> The purpose of this letter is to again request that you comply with your contractual obligations. Please confirm you understand and please inform me of your current status relating to Planetary and Source Naturals/Threshold Enterprises . . . . Any failure to address this as soon as you can will likely leave [defendant] no choice but to pursue appropriate relief . . . ."

(Traficanti Decl., Ex. 3; *see also* Lancia Decl., Ex. 2; Plf. Aff., ¶ 35)[8].

---

[8] On June 20, 2016, Traficanti sent the letter to plaintiff by email with the following message: "It is important that we discuss this matter ASAP. We have attempted to also deliver this to your former NY address, but it appears you may have moved. If you indeed have done so in order to accept the position with Threshold during the pendency of your non-compete with [defendant], then we may have a problem here, so I think it is best for you to call me upon receiving this. Thanks." (Lancia Decl., Ex. 2). In a responsive email, plaintiff indicated: "You had the right address letter came today 2 day air must have been mailed this past Friday 6/17. Let's continue our conversation Tuesday." (*Id.*) (grammatical errors in original).

By letter dated the same date, *i.e.*, June 17, 2016, Ira L. Goldberg ("Goldberg"), the CEO and president of Threshold, offered plaintiff a position at Threshold as "Divisional President and Chief Operating Officer (COO) Brand Manufacturing for Source Naturals and [its] other manufactured brands" based at Threshold's corporate office in Scotts Valley, California. (Plf. Aff., Ex. 3). Threshold is a wholesale distributor of natural beauty products and nutritional supplements throughout the United States and in international markets, (Hatchett Decl., ¶ 10 and Exs. 1 and 2),[9] and also manufactures, and is the sole distributor of, Source Naturals® and Planetary Herbals® brands. (*Id.*, Ex. 1)[10].

Pursuant to Goldberg's employment offer, plaintiff would begin employment at Threshold at an annual base salary of four hundred thousand dollars ($400,000.00), and would "be eligible to receive a discretionary fiscal year Performance Bonus equivalent up to 50% of [his] base pay. . . ." (Plf. Aff., Ex. 3). In addition, Threshold agreed, *inter alia*, to "arrange and pay for transportation of [plaintiff's] automobile to California;" to "pay reasonable monthly rent up to one year while [plaintiff] continue[d] to lease [his] primary residence" in the area; to "advance any security deposits required to lease [plaintiff's] rental property;" to waive "its standard ninety day restriction on [plaintiff's] ability to receive benefits and permit[] [plaintiff] to sign up for medical, dental and vision benefits commencing on [his] first day of employment;" and to "award [plaintiff] two (2) weeks (10 days) of PTO [Paid Time Off] beginning on [his]

---

[9] *See also* www.thresholdenterprises.com/articles/5391/ (last visited 8/16/2016) (indicating that Threshold "is a wholesale distributor of dietary supplements and health care products to the natural foods industry and health care professionals" that "does not sell directly to consumers.").

[10] *See also* www.sourcenaturals.com/library/about/9706 (last visited 8/17/16) (indicating that Threshold "also manufactures Source Naturals® and Planetary Herbals® brands . . . .")

first day of employment[] . . . [and] three (3) weeks (15 days) of PTO annually." (*Id.*) However, Threshold's employment offer "is contingent upon [plaintiff] providing [it] a court decision or other written documentation affirming that [his] hire by [it] does not violate a noncompetition [sic] or any other agreement with [defendant]." (*Id.*)

Enclosed with Threshold's offer letter was a Pre-Employment Agreement signed by Goldberg on June 17, 2016, indicating, *inter alia*, that Threshold (a) "does not seek to hire [plaintiff] to gain any unfair advantage, but seeks to hire him, as it hires others, for his leadership skills, abilities and experience[;]" (b) "does not want [plaintiff's] former employer's trade secrets, if any, or any other confidential or proprietary information that he may have acquired for any former employer[;]" and (c) directs plaintiff, and plaintiff agrees, "not to (i) bring with him to Threshold anything that belongs to any of his former employers or (ii) use any of his former employer's trade secrets (if any), or other proprietary or confidential business information in the course of his employment for Threshold." (Plf. Aff., Ex. 3).

Plaintiff claims that [defendant] does not currently manufacture supplements and did not do so at any time [he] was employed by [defendant]." (SAC, ¶ 21; Plf. Aff., ¶ 31). Hatchett avers: (1) that "Threshold competes directly with [defendant] and specifically with Select Nutrition in, among other markets, the vitamin, natural beauty items, and nutritional supplement distribution markets[;]" (2) that Threshold "share[s] many of the same customers and vendors and appear[s] at many of the same trade shows [as Select Nutrition], including Natural Products Expo East and Natural Products Expo West[;]" and (3) that Threshold's "Source Naturals® brand competes directly with the products distributed by Select Nutrition." (Hatchett Decl., ¶ 13). Moreover, according to Hatchett, "it would be extremely difficult, if not impossible, to separate the manufacturing of competing products from the sourcing, pricing, marketing and

other aspects relevant to their distribution[]" because "[b]ased on [his] knowledge of the industry, manufacturing of branded products such as Source Naturals® necessarily requires an understanding of the preferences of the customers to whom they will be marketed and sold and understanding of the competitive market in which they will be sold." (*Id.*, ¶ 14). Hatchett avers that "[t]his is especially true because Threshold's Source Naturals® products sometimes compete with the other products it distributes." (*Id.*)

According to Hatchett, "[k]nowledge of [defendant's] proprietary information about th[o]se aspects of its business would be highly valuable to any direct competitor, like Threshold, which distributes the same and competing products sourced [sic] from many of the same vendors to the very same customers as [defendant]." (Hatchett Decl., ¶ 15). "By way of example, if a direct competitor knew [defendant's] procurement pricing and volume, it could leverage that knowledge in negotiating with suppliers[;] . . . [and] if a direct competitor knew [defendant's] pricing for specific products for specific customers, it could use that information to undercut [defendant]." (*Id.*) Hatchett avers that defendant's "confidential procurement, pricing, customer, and supplier information generally retains it competitive value from year-to-year[,] . . . [and] although [defendant's] business strategy documents and other plans may be revised on an annual basis, some of the confidential information in those documents and plans stays consistent from year-to-year and is related to [defendant's] long-term business strategies and plans." (*Id.*, ¶ 16).

Moreover, according to Dziki, "[i]n [his] experience in the natural food distribution industry, any individual who has the title of Chief Operating Officer must necessarily be involved in overall competitive strategy, pricing, marketing and customer related issues at the company[]" in order to "effectively perform the duties traditionally associated with those [sic] job titles [sic]." (*Id.*, ¶ 20). Plaintiff contends, *inter alia*, that since Dziki's "primary experience

at [defendant] consists of directing [its] Human Resources Department[,]" this conclusion is "outside of his area of expertise." (Plf. Reply, ¶ 6).

Plaintiff avers, *inter alia*, that he "ha[s] not been on [defendant's] leadership team since 2013, which is where the marketing strategy is discussed[;]" that "[c]ustomer lists for all distributers in this market are generally similar, meaning everyone basically feeds off the similar customer lists[;]" and that "[o]ther than the few assignments given to [him] from April to September 30, 2015, [he] ha[s] not been working for [defendant] for one year and three months." (Plf. Reply], ¶ 3).

Plaintiff alleges that since his last severance payment was April 15, 2016, enforcement of the non-competition clause "will leave him without income until April 15, 2017, or one entire year from the date of his last severance payment[,] [and] [he] would, therefore, be unable to earn a living in his chosen field of work for an entire year." (SAC, ¶ 17). Additionally, plaintiff avers that "[o]ther than savings, [he] really ha[s] no viable means of support[;]" that he is "depleting [his] savings to maintain [his] current standard of living[;]" that he "want[s] and need[s] to work[;]" that the non-competition clause "is the only obstacle to a good job with a good company and a fresh start in a new place[;]" and that he "would like to secure th[e] position [at Threshold] while it is still available to [him], before the offer is revoked[] . . . [and] [his] potential new job is lost." (Plf. Aff., ¶ 37).

B.    Procedural History

On June 24, 2016, plaintiff commenced this action against defendant pursuant to this Court's diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a), seeking, *inter alia*, (1) judgment declaring that the non-competition clause is unenforceable; and (2) damages under the

theory of promissory estoppel and for defendant's alleged breach of contract and tortious interference with prospective economic advantage. Plaintiff filed an amended complaint and second amended complaint on June 27 and 30, 2016, respectively.

Plaintiff now moves pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction enjoining defendant from enforcing the non-competition clause against him.

## III.     Discussion

### A.     Standard

"A preliminary injunction is an equitable remedy and an act of discretion by the court." *American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008); *accord Clapper*, 804 F.3d at 622. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief[,]" *Winter*, 555 U.S. 22, 129 S. Ct. 365, and is "never awarded as of right." *Id.* at 24, 129 S. Ct. 365. "In each case, courts must balance the competing claims of injury[;] consider the effect on each party of the granting or withholding of the requested relief[;] . . . [and] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quotations and citation omitted).

B.      Likelihood of Success on the Merits

1.      Breach of Severance Agreement and/or Amendment

Plaintiff claims that the non-competition clause is unenforceable because defendant has breached a material term of the Severance Agreement and/or Amendment by failing to pay him Paid Time Off accrued during the Interim Period.  Defendant contends that it has not materially breached the Severance Agreement and/or Amendment with plaintiff.

Under Connecticut law, which the parties agree applies in this case,"the mere fact that a contract is breached does not necessarily mean that the contractual relationship between two parties has terminated."  *Landmark Inv. Grp., LLC v. CALCO Constr. & Dev. Co.*, 318 Conn. 847, 866, 124 A.3d 847 (Conn. 2015).  "Indeed, a multitude of issues must be considered in determining whether contractual relations have ceased, including, for example, whether such a breach was material."  *Landmark*, 318 Conn. at 866, 124 A.3d 847; *see also Bernstein v. Nemeyer*, 213 Conn. 665, 672-73, 570 A.2d 164 (Conn. 1990) ("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged."); *A.S. v. Trumbull Bd. of Educ.*, 414 F. Supp. 2d 152, 187 (D. Conn. 2006) ("A party that has materially breached a contract may not recover under it.")

A material breach of contract is "a breach that goes to the root or essence of the agreement between the parties, or . . . touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract[.]" *United States v. Cohan*, 111 F. Supp. 3d 166, 172-73 (D. Conn. 2015), *aff'd* — F. App'x —, 2016 WL 3435366 (2d Cir. June 21, 2016) (quotations, alterations and citation omitted).  "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the

extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Shah v. Cover-It, Inc.*, 86 Conn. App. 71, 75-76, 859 A.2d 959 (Conn. App. 2004) (alterations omitted) (quoting 2 Restatement (Second) of Contracts, § 241); *see also Bernstein*, 213 Conn. at 672, 570 A.2d 164; *Cohan*, 111 F. Supp. 3d at 173. "The standards of materiality are to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances. Section 241 therefore states circumstances, not rules, which are to be considered in determining whether a particular failure is material." *Shah*, 86 Conn. App. at 76, 859 A.2d 959 (quotations, alterations and citation omitted); *accord 669 Atlantic St. Assocs. v. Atlantic-Rockland Stamford Assocs.*, 43 Conn. App. 113, 128, 682 A.2d 572 (Conn. App. 1996).

"[T]he general rule with respect to compliance with contract terms [] is not one of strict compliance, but substantial compliance." *Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675, 89 A.3d 869 (Conn. 2014) (quotations, alterations and citation omitted). "The doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance[,]" *id.* (quotations and citation omitted), pursuant to which "a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been

committed is immaterial." *Id.* (quotations and citation omitted). "Substantial performance occurs when, although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, the [party] has received substantially the benefit he expected, and is, therefore, bound to perform." *Id.* at 684, 89 A.3d 869 (quotations, alterations and citation omitted).

Plaintiff has not demonstrated a likelihood of success on its claim that defendant materially breached the Severance Agreement and/or Amendment because, *inter alia*, defendant paid at least a substantial portion of plaintiff's bargained-for compensation, *i.e.*, his full salary during the Interim Period; any Paid Time Off that had accrued as of April 2015; and the full severance payments due him thereunder, totaling approximately three hundred nine thousand dollars ($309,000.00), exclusive of the value of the medical benefits he continued to receive, (Plf. Aff., ¶¶ 28-29; SAC, ¶¶ 14, 16; Plf. Reply, ¶ 13; Dziki Decl., ¶¶17-18; Traficanti Decl., ¶¶ 7-8); and plaintiff did not claim that defendant's failure to pay him approximately twelve thousand dollars ($12,000) for the Paid Time Off he purportedly accrued during the Interim Period, *i.e.*, from April 1, 2015 to September 30, 2015, or less than five percent (5%) of the compensation due him, constituted a default of the Severance Agreement and/or Amendment until after defendant sought to enforce the non-competition clause against him. *See, e.g. Pack 2000*, 311 Conn. at 685-86, 89 A.3d 869; *Van Dyck Printing Co. v. DiNicola*, 43 Conn. Supp. 191, 199, 648 A.2d 898 (Conn. Super. Ct. 1993), *aff'd*, 231 Conn. 272, 648 A.2d 877 (Conn. 1994); *Carlyle Johnson Mach. Co., LLC v. April*, No. CV 9704812443S, 2000 WL 234311, at * 4 (Conn. Super. Ct. Feb. 10, 2000) (unpublished opinion). Plaintiff was deprived of only a small percentage of the compensation he reasonably expected under the Severance Agreement and/or Amendment; he can be adequately compensated for the part of the benefit of which he was

deprived by an award of damages if he is ultimately successful on his breach of contract claim against defendant; and defendant would be deprived of the entire benefit it expected under the Severance Agreement and/or Amendment if the non-competition clause is not enforced despite having substantially complied with its obligations thereunder.  Thus, even assuming, *arguendo*, that defendant's failure to pay plaintiff the Paid Time Off he allegedly accrued during the Interim Period constitutes a breach of the Severance Agreement and/or Amendment, such failure did not materially impair the rights that plaintiff bargained for when the parties entered into the Severance Agreement and Amendment.  Accordingly, defendant's purported breach of the Severance Agreement and/or Amendment is immaterial and does not discharge plaintiff's obligations under the non-competition clause or render the non-competition clause unenforceable.

### 2.     Reasonableness of Covenant Not to Compete

Plaintiff claims that the non-competition clause is unenforceable because it is not reasonable under Connecticut law.  Defendant contends that the non-competition clause is reasonable and unenforceable.

Under Connecticut law, "a covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable." *Minnesota Mining & Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 279 (D. Conn. 2002); *see also Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 144 (D. Conn. 1997) ("A restrictive covenant not to compete may be enforceable if the restraint is reasonable under the circumstances.")  "When evaluating the reasonableness of covenants not to compete, Connecticut courts look to five factors: (1) the length of time the restriction operates; (2) the

geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 293 (D. Conn. 2015) (quotations and citation omitted); *see also Scott v. General Iron & Welding Co., Inc.*, 171 Conn. 132, 137, 368 A.2d 111 (Conn. 1976) ("In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place, [] and must be reasonable- that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. . . . The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursing his occupation and thus prevented from supporting himself and his family." (quotations, alterations and citations omitted)). "These criteria are disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." *A.H. Harris*, 94 F. Supp. 3d at 293 (quotations and citation omitted).

Although plaintiff makes much of the fact that his employment with defendant was terminated without cause, that fact is irrelevant under Connecticut law because "the reasonableness of a restrictive covenant of employment does not turn on whether the employee subject to the covenant left his position voluntarily or was dismissed by the employer." *Robert S. Weiss & Assocs., Inc. v. Wiederlight*, 208 Conn. 525, 532, 546 A.2d 216 (Conn. 1988). Similarly, "the standards for reasonableness of a restrictive covenant . . . do not include as an element an examination of the motives behind attempting to enforce the covenant . . . ." *A.H. Harris*, 94 F. Supp. 3d at 301.

a.      Length of Time and Geographical Area Covered

"Ordinarily, under Connecticut law, time and geographical restrictions are to be reviewed as intertwined considerations, meaning, for instance, that a restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might be reasonable for a longer time." *A.H. Harris*, 94 F. Supp. 3d at 293 (quotations, alterations and citation omitted).  Generally, "time and geographic restrictions in a covenant not to compete are valid if they are reasonably limited and fairly protect the interests of both parties."  *Wiederlight*, 208 Conn. 525, 530, 546 A.2d 216 (Conn. 1988).

"Connecticut courts have upheld restrictive covenants[] . . . lasting two years or more on multiple occasions." *A.H. Harris*, 94 F. Supp. 3d at 294 (citing cases); *see also Minnesota Mining*, 191 F. Supp. 2d at 280.  Since the effectively eighteen (18)-month long restriction in the Severance Agreement fairly protects defendant's interests in the natural and organic foods distribution business while ensuring that plaintiff can return to that business within a definite and reasonable period of time, the time limitation in the non-competition clause of the Severance Agreement is reasonable.  *See, e.g. Wiederlight*, 208 Conn. at 530, 546 A.2d 216; *Minnesota Mining*, 191 F. Supp. 2d at 280.

Although the non-competition clause does not contain a geographic limitation within the United States, it is nonetheless reasonable given the national scope of defendant's business and because it is limited to only potential employers within the United States who are direct competitors of defendant, of which, according to defendant, there are only twenty-nine (29).  Accordingly, by its own terms, the non-competition clause does "not protect the employer in areas where it [does] not do business[,]" *Wiederlight*, 208 Conn. at 532, 546 A.D.2d 216; *see also Minnesota Mining*, 191 F. Supp. 2d at 280, and, thus, is not overly-broad and is reasonable.

b.    Fairness of Employer's Protection

In *Wiederlight*, the Supreme Court of the State of Connecticut held that:

> "when the character of the business and the nature of the employment are such
> that the employer requires protection for his established business against
> competitive activities by one who has become familiar with it through
> employment therein, restrictions are valid when they appear to be reasonably
> necessary for the fair protection of the employer's business or rights.[]  Especially
> if the employment involves [] the employee's contacts and associations with
> clients or customers it is appropriate to restrain the use, when the service is ended,
> of the knowledge and acquaintance, so acquired, to injure or appropriate the
> business which the party was employed to maintain and enlarge."

*Id.*, 546 A.2d 216, 221, 208 Conn. at 533, 546 A.2d 216 (quotations, alterations and citation

omitted); *accord Minnesota Mining*, 191 F. Supp. 2d at 280-81.

In light of, *inter alia*, the fact that plaintiff held a high-level position with defendant and,

thus, has specialized knowledge of defendant's internal structure and business, marketing and

pricing strategies, the restrictions in the non-competition clause appear reasonably necessary for

the fair protection of defendant's business.  Defendant has a legitimate concern about plaintiff

being able to utilize his knowledge of its inner workings to the benefit of one of its direct

competitors and to its own detriment, *see, e.g. A.H. Harris*, 94 F. Supp. 3d at 297, and the level

of protection that the restrictions in the non-competition clause afford to defendant is reasonably

necessary to protect its business rights.  *See, e.g. Minnesota Mining*, 191 F. Supp. 2d at 281.

Indeed, the Severance Agreement itself contains an acknowledgment by plaintiff that the

possible restrictions on his work activities which may occur as a result of the non-competition

clause "are required for the reasonable protection of [defendant] and its investments, and . . . that

such restrictions are fair and reasonable for that purpose."  (Plf. Aff., Ex. 1, § 6(e)).  While such

acknowledgments "are not binding on the court,[] which must determine whether the covenant is

reasonable as a matter of law, there is no good reason why the[y] . . . ought not to be considered

by the court[,]" particularly in light of the "strong public policy in Connecticut favoring freedom of contract[,] . . . includ[ing] the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract." *Fairfield County Bariatrics & Surgical Assocs., P.C. v. Ehrlich*, No. FBTCV1050291046, 2010 WL 1375397, at * 31 (Conn. Super. Ct. Mar. 8, 2010). Accordingly, the protection afforded to defendant by the non-competition clause is reasonably fair and not overly expansive.

### c.      Reasonableness of Restraint on Employee's Occupation

"In addition to considering the fair protection of the employer, the interests of the employee herself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from supporting herself and her family." *A.H. Harris*, 94 F. Supp. 3d at 297–98 (quotations, alterations and citation omitted). "Under this consideration, the test for reasonableness is not whether the defendant would be able to make a living in other ways, or in other occupations, but whether or not the Agreement as drafted and applied would unfairly restrain her 'opportunity' to pursue her occupation." *Id.* at 298 (quotations, alterations and citation omitted). The validity of a non-competition clause is not to be determined "by the language in which [it] [is] couched, but by a factual inquiry into whether [it] [is] reasonably limited and fairly protect[s] the interests of both parties." *Id.* (quoting *Schoonmaker v. Cummings & Lockwood of Conn., P.C.*, 252 Conn. 416, 747 A.2d 1017, 1040 (2000) (internal quotations omitted)).

The non-competition clause in the Severance Agreement represents a reasonable restraint on plaintiff's opportunity to pursue his occupation because, *inter alia,* defendant is seeking only to prevent plaintiff from working with one of its twenty-nine (29) direct competitors nationwide,

including Threshold.  *See, e.g. A.H. Harris*, 94 F. Supp. 3d at 298 (finding that the restrictive

covenants at issue, which enjoined the defendant from working with a direct competitor,

represented a reasonable restraint on the defendant).  The restrictive covenant does not prohibit

plaintiff from working for a national or international company in the natural foods industry that

is not one of the twenty-nine (29) direct competitors of defendant; and plaintiff can even work

for one of those direct competitors of defendant in any capacity he chooses after April 15, 2017.

Accordingly, the non-competition clause does not unfairly restrain plaintiff's opportunity to

pursue his occupation in the natural foods industry.


d.        Interference with Public Interest

Under Connecticut law, in order for a restrictive covenant to not unreasonably interfere

with the public's interest, "it first must be determined that the employer is seeking to protect a

legally recognized interest, and then, that the means used to achieve this end do not unreasonably

deprive the public of essential goods and services."  *New Haven Tobacco Co. v. Perrelli*, 18

Conn. App. 531, 536, 559 A.2d 715 (Conn. App. 1989); *accord A.H. Harris*, 94 F. Supp. 3d at

299.  "[I]n determining whether a restrictive covenant unreasonably deprives the public of

essential goods and services, the reasonableness of the scope and severity of the covenant's

effect on the public and the probability of the restriction's creating a monopoly in the area of

trade must be examined."  *Perrelli*, 18 Conn. App. at 536, 559 A.2d 715; *accord A.H. Harris*, 94

F. Supp. 3d at 299.  As set forth above, defendant is seeking to protect a legally recognized

interest, and enforcement of the non-competition clause in the Severance Agreement does not

pose a risk of granting defendant a monopoly over the natural and organic foods industry in the

United States, particularly since the evidence shows that defendant has twenty-nine (29) direct

competitors. Thus, preventing plaintiff from working for one of those direct competitors in the natural and organic food industry until April 15, 2017 will not deprive the public of any essential good or service. *See, e.g. A.H. Harris*, 94 F. Supp. 3d at 299. Accordingly, plaintiff has not demonstrated a likelihood of success on the merits of his claim that the non-competition clause in the Severance Agreement is unreasonable or otherwise unenforceable under Connecticut law.[11]

C.      Balance of Equities

Denying plaintiff's motion for a preliminary injunction will preserve the status quo; keep the parties in the position in which they themselves contracted to be; and enforce plaintiff's promises and obligations in the Severance Agreement and Amendment for which he received more than adequate consideration, *i.e.*, his full salary and medical benefits during the Interim Period; Paid Time Off that accrued as of April 2015; and the full amount of severance payments due him thereunder, in the amount of three hundred nine thousand dollars ($309,000.00), exclusive of the value of the continued medical benefits. Although prohibiting plaintiff from working with Threshold may affect his employment opportunity with that company, the non-competition clause is not unreasonable and does not prevent him from obtaining comparable employment with any national or international company other than the approximately twenty-nine (29) direct competitors of defendant. Since any harm to plaintiff caused by the lost employment opportunity at Threshold is outweighed by the potential harm to defendant's business interests if the non-competition clause is not enforced, as set forth above, the balance of

---

[11]  In light of this determination, it is unnecessary to consider whether plaintiff will suffer irreparable harm absent preliminary injunctive relief.

equities weighs in favor of denying plaintiff's motion for a preliminary injunction. *See, e.g.*

*Weseley Software*, 977 F. Supp. at 147 (finding that the balance of equities favored enforcing the

restrictive covenant notwithstanding that it interfered with a prospective employment opportunity

of the defendant-former employee because absent enforcement, the plaintiff-former employer

would be competitively disadvantaged and have no adequate remedy at law, whereas the

defendant had other employment options and was not foreclosed from ever working for the

prospective employer); *Cf. A.H. Harris*, 94 F. Supp. 3d at 301-02. Accordingly, plaintiff's

motion for a preliminary injunction is denied.


IV.     Conclusion

        For the reasons set forth above, plaintiff's motion for a preliminary injunction pursuant to

Rule 65 of the Federal Rules of Civil Procedure is denied.

SO ORDERED.


                                        *s/ Sandra J. Feuerstein*
                                        Sandra J. Feuerstein
                                        United States District Judge


Dated: August 31, 2016
        Central Islip, New York